# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LAUREN KERESI,

                 *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

                 *Defendant*.

_____/

CASE NO. 15-12675

DISTRICT JUDGE ARTHUR J. TARNOW

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 11, 12)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Keresi is not disabled. Accordingly, **IT IS RECOMMENDED** that Keresi's Motion for Summary Judgment (Doc. 11) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 12) be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims under the Child Disability Benefits ("CDB") program of Title II of the Social Security Act, and  Supplemental Security Income ("SSI") program of

Title XVI, 42 U.S.C. § 1381 *et seq.*. (Doc. 3; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 12).

Plaintiff Lauren Keresi was nineteen years old as of January 1, 2011, her date of alleged disability. (Tr. 142). Her applications for benefits were initially denied on May 22, 2013. (Tr. 97-98). Keresi requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Henry Kramzyk on December 3, 2013. (Tr. 39-74). Keresi, unrepresented by counsel, testified, as did her grandmother Cecelia Keresi, and vocational expert ("VE") Mary Everts. (*Id.*). On February 13, 2014, the ALJ issued a written decision in which he found Keresi not disabled. (Tr. 21-35). On June 1, 2015, the Appeals Council denied review. (Tr. 1-3). Keresi filed for judicial review of that final decision on July 29, 2015. (Doc. 1).

### B.   Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . .

physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ found Keresi not disabled under the Act. (Tr. 34). The ALJ found at Step One that Keresi had not engaged in substantial gainful activity following the alleged onset date, January 1, 2011. (Tr. 26). At Step Two, the ALJ concluded that Keresi had the following severe impairments: "ADHD; borderline intellectual functioning; and Asperger's syndrome."[1] (*Id*.). At Step Three, the ALJ found that Keresi's combination of impairments did not meet or equal one of the listed impairments. (Tr. 27-28). The ALJ then found that Keresi had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, except with nonexertional limitations as follows:

---

[1] Asperger's syndrome is "a pervasive developmental disorder characterized by severe and enduring impairment in social skills and restrictive and repetitive behaviors and interests, leading to impaired social and occupational functioning but without significant delays in language development." Stedman's Medical Dictionary (27th ed. 2000).

5

> [A]ble to understand, remember and carry out short, simple, repetitive instructions; able to sustain attention/concentration for 2-hour periods at a time and for 8 hours in the workday on short, simple, repetitive instructions; can use judgment in making work decisions related to short, simple, repetitive instructions; requires an occupation with only occasional co-worker contact and supervision; requires an occupation with set routines and procedures, and few changes during the workday; requires an occupation with no contact with the public; no fast paced production work; can maintain regular attendance and be punctual within customary tolerances; and can perform activities within a schedule.

(Tr. 28-33). At Step Four, the ALJ found that Keresi had no past relevant work. (Tr. 33). At Step Five, the ALJ concluded that Keresi retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 33).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has thoroughly reviewed Keresi's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### a.    Keresi's Function Report

Keresi completed a function report on May 1, 2013, in which she asserted that her illnesses caused pain when walking up and down stairs. (Tr. 175-85). Keresi said that she was unsure how her conditions limited her ability to work because she "never had a real job," and while she "had job training once," it "didn't go well." (Tr. 178). She spent her days on the computer, watching television, and eating. (Tr. 179). Her hobbies included

6

reading, using the computer, watching television, watching movies, and talking. (Tr. 182). She did not care for any other person or pet. (Tr. 179). She slept "a lot." (*Id.*). In terms of personal care, she required help with laundry, needed reminders to bathe, shave, and care for her hair. (*Id.*). She prepared sandwiches and soup, and could use the microwave. (Tr. 180). She cleaned the floors and kitchen at home, and did the laundry, though she required reminders to do so. (*Id.*).

Keresi left home "once and [sic] awhile," and traveled by car, though she did not feel "comfortable enough on the road" to drive. (Tr. 181). She shopped in stores occasionally. (*Id.*). She could count change, but did not use bank accounts or checkbooks. (*Id.*). She went out to movies monthly, and required accompaniment. (Tr. 182). She reported that her conditions "ha[d]n't changed." (Tr. 183). She further reported that she had difficulties with following instructions, completing tasks, and concentrating. (*Id.*). She walked slowly, was distracted easily, and had difficulty following spoken instructions, but could "stay focused enough pretty well" if provided with written instructions. (*Id.*). She got along well with authority figures "fine," handled stress "fine," and reported that she did not "have a routine," thus was unsure how she would handle changes in routine. (Tr. 184). She did not use any medication. (Tr. 185).

### b.      Cecelia Keresi's Third-Party Function Report

On April 30, 2013, Cecelia Keresi, grandmother to Keresi, completed a third-party function report. (Tr. 158-65). Cecelia wrote that she lived with Keresi full time, and that Keresi's limitations prevented her from participating in "productive life outside the

7

house," that she had "abnormal" fears, that her social skills were limited, and that her conversations were limited to topics like television shows. (Tr. 158). She confirmed that Keresi spends her days eating, watching television, and using the computer. (Tr. 159). Keresi had "minimal hygiene," and had some difficulty sleeping. (*Id.*). She wore the same clothes for several days, needed to be reminded "constantly" to bathe, and to care for her hair and shave, but had no difficulty eating or using the toilet on her own. (*Id.*). Regarding food, Cecelia said Keresi was "afraid of stove," and could not "plan one or more things," presumably referring to difficulty preparing complex meals. (Tr. 160). Keresi was "not always cooperative" in terms of doing chores. (Tr. 161). Keresi engaged in "Computer - Harry Potter role playing" on an almost daily basis, though the degree to which this activity involved interaction with other persons was not elucidated. (Tr. 162). In terms of social activities, Cecelia reported that Keresi made "some people uncomfortable, violates personal space, stares, talks loud, repeats herself, stutters gets excited the longer she talks." (Tr. 163). She wrote that Keresi had difficulty walking, sitting, talking, completing tasks, concentrating, following instructions, and using her hands. (*Id.*). If Keresi did not understand something, she would "shut[] down or change[] subject completely." (*Id.*). She followed written instructions "not well," and was "worse with verbal instructions." (*Id.*). Likewise she had difficulty with stress, and did "not do well" with changes in routine. (Tr. 164). Finally, Cecelia wrote that childhood testing of Keresi revealed possible fetal alcohol syndrome, that she had a non-verbal learning disability, was treated for ADHD in high school, and had taken Concerta to no effect. (Tr.

8

165). Likewise, she noted that Keresi took a "long" time to complete the function report form, and "became very frustrated and worried." (*Id*.).

### c.     Keresi's Testimony at the Administrative Hearing

At the December 3, 2013, hearing before the ALJ, Keresi waived her right to be represented by counsel. (Tr. 44). She testified that she was prevented from working by becoming "easily distracted," that she had difficulty concentrating, and that several doctors had noticed "signs of Asperger's." (Tr. 51). She attested to having anxiety, but did not think she had ADHD. (*Id*.). She could lift thirty or forty pounds, did not experience pain, and had no physical maladies of note. (Tr. 53-54).

Keresi testified to sweeping, vacuuming, cooking small meals, using the dishwasher, and doing laundry. (Tr. 55-56). She shoveled snow in the winter. (Tr. 59). She did not use public transportation. (Tr. 56). She enjoyed using the internet, reading, playing with her phone, talking to her friends, playing games, and watching television. (Tr. 56-57). In particular, she enjoyed Harry Potter books and watching ABC Family and the Disney Channel. (Tr. 61). She could use the computer to perform research, used Facebook, and played computer games. (*Id*.). She went to the mall with her friends sometimes, and to the movies occasionally. (Tr. 57). She shopped in stores occasionally with others. (Tr. 58). She had no difficulty interacting with strangers for the purpose of shopping. (Tr. 60).

Cecelia then testified. (Tr. 62-63). She stated that she and Keresi pursued few recreational activities. (Tr. 63-64). She reported that Keresi had a "rough upbringing,"

and that she showed signs of a learning disability as early as first grade. (Tr. 65). During therapy, Keresi had difficulty with responsibility and completing tasks. (*Id.*). Keresi got lost in conversation, repeated things several times, and had a worsening problem with stuttering. (Tr. 66). Cecelia stated that Keresi required greater assistance from the Guidance Center, but could not afford that therapy. (*Id.*). She wanted Keresi to get additional training to "become part of a job hunt again," and to get "job training," but that she "just does not have the ability to pay." (*Id.*). At the end of the hearing, Cecelia interjected that Keresi would be unable to perform work, because she "has gone on interviews," but "makes people uncomfortable," and that she "has a nervous energy." (Tr. 74).

### d.        The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Keresi's ability to perform work. (Tr. 69). The ALJ asked the VE to assume a hypothetical individual with Keresi's age, education, and work experience, and who had no exertional limitations, but who

> is able to understand, remember, and carry out short, simple, repetitive instructions. Is able to sustain attention and concentration for two hour periods at a time and for eight hours in the work day on short, simple, and repetitive instructions. Can use judgment in making work decision related to short, simple, and repetitive instructions. Requires an occupation with only occasional coworker contact or supervision. Requires an occupation that's set, routine in procedures and few changes during the work day. This hypothetical individual requires work that does not involve any contact with the public. This hypothetical individual cannot do any fast paced production work, but can maintain regular attendance to be punctual within customary tolerances and could perform activities within a schedule.

(Tr. 69-70). The VE found that such a worker could perform work available in the national economy, including packer, a medium exertion position with a specific vocation preparation ("SVP") of two (165,000 jobs nationally), material mover, also a medium exertion position and also with a SVP of two (580,000 nationally), and food preparation worker, also with a medium exertion level and also a SVP of two (174,000 nationally). (Tr. 70-71).

The ALJ then asked a second hypothetical question which included the prior restrictions, but which also included restrictions to the hypothetical worker's ability to lift and perform other postural movements. (Tr. 71). The VE found that such a worker could still perform work as a housekeeper (377,000 jobs), inspector (120,000 jobs), and packer (320,000 jobs). (Tr. 72).

Finally, the ALJ inquired as to whether a worker with the limitations described in the prior two hypotheticals, but who also suffered from an inability to maintain punctuality within customary tolerances, and thus could not perform activities within a schedule could perform work. (Tr. 73). The VE found that such a limitation would be work-preclusive. (*Id*.).

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513.

11

"Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to

12

"other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

13

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. §

14

404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)    [D]aily activities;
    (ii)   The location, duration, frequency, and intensity of . . . pain;
    (iii)  Precipitating and aggravating factors;
    (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)   Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

15

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.      Analysis

Keresi argues that the ALJ erred in the following ways: 1) Failing to conclude that Keresi meets Listing 12.10 due to her Asperger's syndrome; 2) Inadequately developing the record by not eliciting testimony from Keresi or Cecelia regarding Keresi's Asperger's syndrome; 3) Crafting an RFC assessment which does not properly account for Keresi's substantial social impairment. (Doc. 11 at 9-15). These arguments will be addressed in turn.

### 1.      *The ALJ Properly Found that Keresi Does Not Meet Listing 12.10*

Keresi does not clearly assert that she meets any listing, but rather notes that she experiences difficulties with socialization, reading and responding to emotions normally, and has certain compulsive behaviors involving electronic media, all of which are

16

consistent with her Asperger's Syndrome diagnosis. (Doc. 11 at 10-11). Likewise, she notes that "social competence is so critical to employability that the listings include a section that encompasses the deficits associated with Asperger Syndrome. § 12.10." (*Id.* at 11). She then describes the five-week course of treatment she undertook with the Asperger's Growth and Development group, and details the focus of each week's sessions, including etiquette, hygiene, social coordination, and body positioning. (*Id.* at 12-13). Keresi also lists some, but not all, of the factors necessary for a claimant to meet Listing 12.10. (*Id.* at 11-12). Read generously, Keresi can be understood to assert that she meets or equals Listing 12.10, and that the ALJ therefore erred by finding her not disabled.

Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof: listed impairments preclude any gainful activity, not just substantial gainful activity. *See Sullivan v. Zebley*, 493 U.S. 521, 525 (1990); 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id. See also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence of a Listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526). The ALJ retains discretion at this stage, and does not need to attach "any special significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment meets or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the analysis: "[A]n ALJ is capable of reviewing records to determine whether a claimant's ailments *meet* the Listings." *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quotation omitted). The Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3.

"When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Social Sec. Admin.*, 93 F. App'x 725, 728

18

(6th Cir. 2004) (citation omitted). Consequently, an ALJ's Listing analysis must be viewed in light of the evidence the claimant presents.

Listing 12.10 sets forth the following criteria which a claimant must meet to qualify as disabled under that listing:

> A. Medically documented findings of the following:
>> 1. For autistic disorder, all of the following:
>>> a. Qualitative deficits in reciprocal social interaction; and
>>> b. Qualitative deficits in verbal and non-verbal communication and in imaginative activity; and
>>> a. Markedly restricted repertoire of activities and interests;
>
> OR
>> 2. For other pervasive developmental disorders, both of the following:
>>> a. Qualitative deficits in reciprocal social interaction; and
>>> b. Qualitative deficits in verbal and nonverbal communication and in imaginative activity;
>
> AND
> B. Resulting in at least two of the following:
>> 1. Marked restrictions of activities of daily living; or
>> 2. Marked difficulties in maintaining social functioning; or
>> 3. Marked difficulties in maintaining concentration persistence or pace; or
>> 4. Repeated episodes of decompensation each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1. At the outset, it cannot be doubted that Keresi has Asperger's Syndrome, a condition for which she has been diagnosed and treated. (*See, e.g.*, Tr. 266, 305, 311). Yet a diagnosis of Asperger's Syndrome is not enough to meet Listing 12.10. Only one physician, non-examining agency physician Dr. Thomas Tsai, considered whether Keresi met that listing; he found that she did not. (Tr. 82). He

concluded that Keresi suffered from mild restrictions to her activities of daily living; moderate limitations to her social functioning; mild limitations to her ability to maintain concentration, persistence, or pace; and had not experienced repeated, extended episodes of decompensation. (*Id*.). After considering the totality of the medical evidence, Dr. Tsai concluded that Keresi's impairments did "not precisely satisfy the diagnostic criteria" for Listing 12.10. (*Id*.).

When it is properly referenced and supported by analysis in the decision, a non-examining state agency physician's finding that a claimant does not equal a listing can satisfy the ALJ's duty to consider equivalence. See *Hayes v. Comm'r of Soc. Sec.*, No. 11-14596, 2013 WL 766180, at *9 (E.D. Mich. Feb. 4, 2013), report and recommendation adopted, No. 11-14596-DT, 2013 WL 773017 (E.D. Mich. Feb. 28, 2013). In this case, the ALJ gave Dr. Tsai's findings only "partial weight," and did not specifically reference Dr. Tsai's finding that Keresi did not meet a listing. This omission is not fatal to the ALJ's decision. *See N.N.M. v. Colvin*, No. 1:14-CV-1700-DKL-RLY, 2016 WL 1188544, at *5 (S.D. Ind. Mar. 28, 2016) ("In deciding that [the claimant's] impairments did not meet, medically equal, or functionally equal a listed impairment, the ALJ did not specifically cite the[ state agency] psychologists' opinions. However, the record contains no contrary opinion of any physician or psychologist."); *Veal v. Astrue*, No. CIV 07-436-CJP, 2008 WL 4449510, at *4 (S.D. Ill. Sept. 29, 2008) ("Although the ALJ did not specifically mention the opinions of agency physicians . . . both concluded [she] did not meet a listing, and that she did not have the required marked or extreme

20

domain limitations necessary for an equivalency . . . . There is no contradictory medical evidence."); *May v. Apfel*, No. 98 C 1647, 1999 WL 1011927, at \*19 (N.D. Ill. Sept. 30, 1999) ("The fact that she did not specifically refer to the state agency physician's opinion in determining that Plaintiff's impairments did not meet or equal the Listings is not critical; the ALJ is not required to comment on each piece of evidence."). Additionally, Keresi has not taken issue with the ALJ's decision insofar as he neglected to specifically adopt Dr. Tsai's opinion on equivalence. The ALJ's conclusion that Keresi did not meet or equal a listing is thus properly supported by the opinion of Dr. Tsai.

Keresi points to some elements of her medical record which indicate that she meets parts of Listing 12.10, but she does not, and indeed cannot, demonstrate that she meets each element of that listing. This is fatal to her claim. It is true that Keresi suffers from limitations to her reciprocal social interaction, and verbal and non-verbal communication. She was treated for deficits in social skills in May and August of 2009. (Tr. 233-35). In May 2010 it was noted that she struggled with reading facial expressions. (Tr. 294). In October 2010 it was noted that she had mostly online friends and had difficulty with social interaction. (Tr. 266). In September 2012 she was diagnosed with Asperger's Syndrome. (Tr. 305).

Yet it is also appears Keresi does not suffer from qualitative deficits in imaginative activity. Cecelia wrote in her third-party function report that Keresi engaged in Harry Potter role playing (Tr. 162), Keresi herself stated that she enjoyed reading

21

Harry Potter books[2], watched films and television, played computer games, and used the social networking service Facebook. (Tr. 61).

Precious few cases have addressed the question of how a claimant can prove (and how the Commissioner can defeat) an asserted deficit in imaginative activity. The court in *Venable v. Astrue*, No. CIV. 4:07-CV-04075, 2008 WL 4018124, at *5 (W.D. Ark. Aug. 25, 2008) found that a claimant who "testified he enjoys listening to music and playing on his computer" did not have deficits in imaginative activity. Keresi's interest in fantasy books, television, film, videogames, and role playing permits a reasonable inference that she retains imaginative activity. No medical records contradict this conclusion. As subparts A and B of Listing 12.10 both require deficits in imaginative activity, I suggest that Keresi cannot meet Listing 12.10.

## 2. *The ALJ Sufficiently Developed the Record by Eliciting Testimony from Keresi and Cecelia*

Keresi next argues that the ALJ insufficiently developed the record by asking too few questions of Keresi and Cecelia, the answers to which might have demonstrated her claim to disability. (Doc. 11 at 13-14). Where, as here, a claimant is unrepresented by counsel, the ALJ's "duty to develop a full and fair administrative record is heightened—

---

[2] Importantly, the Harry Potter books are works of fantasy fiction. *See Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 518 (S.D.N.Y. 2008) ("Written for children but enjoyed by children and adults alike, the Harry Potter series chronicles the lives and adventures of Harry Potter and his friends as they come of age at the Hogwarts School of Witchcraft and Wizardry and face the evil Lord Voldemort. . . . It is a tale of a fictional world filled with magical spells, fantastical creatures, and imaginary places and things.").

although it does not remove the burden of proof from the claimant." *Strang v. Comm'r of Soc. Sec.*, 611 Fed. Appx. 271, 276 (6th Cir. 2015). This duty is yet stronger where a claimant who alleges that he or she is disabled by maladies of the mind proceeds without representation. *See Williams v. Comm'r of Soc. Sec.*, No. 12-15075, 2014 WL 822191, at *11 (E.D. Mich. Feb. 10, 2014), report and recommendation adopted, No. 12-15075, 2014 WL 822489 (E.D. Mich. Mar. 3, 2014). As always, ALJ must provide sufficient articulation of his or her findings to permit meaningful review. *Reynolds*, 424 Fed. Appx. at 416; *Woodall v. Colvin*, No. 5:12cv1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013) ("[T]he ALJ must build an accurate and logical bridge between the evidence and his conclusion.").

In this case the ALJ made some inquiries of Keresi at the oral hearing. Review of the oral hearing transcript shows that the ALJ asked Keresi about why she believed she was disabled, her physical capacity, her daily activities, her work history, her psychological treatment, her ability to perform chores and personal care, her hobbies, the activities that she engaged in with friends, her methods of transportation, her social activities, her reading habits, the programs she watches on television, and her use of the internet. (Tr. 44-62). The ALJ also provided Cecelia with the opportunity to opine at length about Keresi's treatment history and mental limitations. (Tr. 63-67).

Keresi first argues that the ALJ's development of the record was insufficient because his questioning "focused exclusively on [her] capacity to complete activities of daily living." (Doc. 11 at 14). Review of the transcript reveals that the ALJ inquired

23

about a variety of topics including Keresi's recreational activities with her friends, including seeing movies, visiting the mall, researching on the internet, using Facebook, watching television, reading, and about her interactions with family and friends. (Tr. 58-62). Keresi wrote in her function report that she experienced some difficulty walking up and down stairs, thus it was reasonable for the ALJ to focus some portion of his questions on Keresi's potentially disabling physical conditions. (Tr. 175-85).

Keresi next asserts that the ALJ did not solicit any testimony about the impact of Keresi's Asperger's Syndrome. (Doc. 11 at 14). As noted above, Asperger's Syndrome is characterized by a severe impairment to social skills and occupational functioning. Stedman's Medical Dictionary (27th ed. 2000). The ALJ's questions at the hearing sufficiently delved into Keresi's symptoms related to Asperger's Syndrome. The ALJ inquired about Keresi's interactions with friends (Tr. 54-56), with strangers in public (Tr. 60), with her family (Tr. 59), and her use of social networking (Tr. 61). He asked Cecelia how Keresi interacted with family. (Tr. 62-65). The ALJ is not required to conduct a perfect hearing or draft a perfect decision, but rather the ALJ's duty is to develop the record in a manner that is "full and fair." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (quotation omitted). I suggest that the ALJ's questioning of Keresi and Cecelia at the hearing fell below this standard.

Keresi also suggests the ALJ inadequately developed the record regarding "inconsistencies between Keresi's assessment of her social abilities and that of the professionals." (Doc. 11 at 14). Keresi does not illuminate specifically which

24

inconsistencies she finds between her evaluation of her social skills and the analyses of her physicians. Asperger's Syndrome is diagnosed and considered several times in the record. (Tr. 266, 305, 311). Treatment providers noted that Keresi experience difficulties with concentration and memory. (Tr. 235, 237-38, 244-45, 248-51, 256). She had poor hygiene and was anxious around strangers. (Tr. 239-42). In August 2009, Keresi was found to have difficulty maintaining friendships. (Tr. 233). During a situational work assessment, she sometimes stopped work to chat with her neighbors, and showed some memory issues. (Tr. 269-70). She struggled with reading and making appropriate facial expressions, and experienced difficulty with decision making. (Tr. 294-96). In August and September of 2010 it was noted that she had some memory difficulties during an employment competency evaluation, and "needed to have tasks repeated for her as she did not always retain her work," and had some difficulty matching shoes. (Tr. 270). She had merely "adequate" attention and concentration, and "poor" judgment and insight in a May 2012 psychiatric evaluation; her Global Assessment Functioning ("GAF") score was rated at 31-40.[3] (Tr. 315-16). Keresi had online friends with whom she would chat, in addition to some in-person friends. (Tr. 266). Cecelia reported to one physician that Keresi was "obsessed" with videogames. (*Id*.).

---

[3] A GAF score of 31–40 indicates "some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th Ed. 1994) at 30.

However, not all of Keresi's medical records paint such a bleak picture of her mental wellbeing. With the exception of her May 2012 psychiatric evaluation, Keresi's GAF score consistently ranged between 55 and 60, a relatively moderate finding.[4] (Tr. 237-38, 239-42, 327, 333). In August and September of 2010, Keresi was rated at seventy to ninety percent of entry level standards in terms of productivity, quality, and independence when performing activities like stocking items, merchandising new stock, sweeping, and cleaning bathrooms. (Tr. 270). She also demonstrated the ability to "cope with stress, change, and conflict on the job." (*Id*.). In October 2010, Keresi herself apparently acknowledged that she may suffer from "mild mental retardation." (Tr. 266). On January 27, 2011, Keresi underwent a mock interview treatment session, wherein she was rated as "good" (the highest available rating) in the areas of appearance, attendance/punctuality, participation, and overall attitude, except for the areas of "able to listen effectively," "cooperates with staff and peers," "works independently," and "accepts constructive criticism," where Keresi was rated as "average," and the "self confidence," where she was rated as merely "fair." (Tr. 281). She performed as well or better in repeat sessions held in January and March of 2011. (Tr. 282-89). During a February 2012  Asperger's treatment session, Keresi engaged in mock interviews, where it was noted that her attire, grooming, and greeting, and presentation ranged from "fair"

---

[4]  A GAF score of 51–60 "indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th Ed. 1994) at 34.

to "excellent." (Tr. 277-78). It was also noted that she had "good eye contact," "spoke clearly," "expressed thoughts clearly," but "presented as a little nervous/excited – will improve with practice." (Tr. 279). Apparently in a later exercise, it was recorded that she was "very enthusiastic," had a "great greeting + smile," put on an "excellent presentation!" wherein she was "very calm and in control," that she was "very confident," sold her skills admirably, "responded well to questions," "watched facial expressions even when confused," and was "overall: wonderful!" (Tr. 280). In March 2012, it was noted that Keresi might "benefit from individual therapy to become better able to recognize problematic issues [as] they may occur in the workplace." (Tr. 296).

Keresi now asserts that her personal assessment of her social abilities differs substantially from those of her treatment professionals. (Doc. 11 at 14). On the whole, Keresi's testimony seems quite consistent with the treatment record. In her function report, Keresi painted a picture of limited activities of daily living, mostly centered on chores, eating, and consuming media. (Tr. 178-85). She recognized that she was distracted easily, needed reminders to perform some personal care tasks and chores, and left home only rarely. (*Id.*). Keresi's testimony at the hearing suggested only a somewhat less restricted existence, including occasional trips to the mall with friends, talking to friends on the computer, and not experiencing difficulty interacting with strangers in stores. (Tr. 58-60). However, Keresi's own descriptions of what she usually does on a given day addresses a different topic from what she is able to do. The latter question is the question answered by her treatment professionals. To the extent that Keresi's

27

description of her daily activities is inconsistent with her treatment professional's evaluation of her potential ability, I suggest that any difference is not due to an inconsistency in answers to the same questions but rather a difference in questions posed and answered. I therefore suggest that ALJ did not err by failing to address or probe into any such alleged inconsistencies.

Additionally, Keresi asserts that the ALJ did not appropriately address the "repeated calls from . . . [Keresi's treating] professionals for a job coach." (Doc. 11 at 14). Indeed, it was suggested that Keresi might benefit from additional workplace training. (Tr. 296). Yet none of Keresi's treating professionals suggested that she was disabled from all work. Instead, a note from Keresi's treating professional suggests that, if properly treated and trained, Keresi could return to work. Where, as here, the referenced note seems to undercut her claim for disability benefits, the ALJ's failure to reference it was not error. *See Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

### 3.  *The ALJ's RFC Finding Sufficiently Accounted for Keresi's Difficulty Interacting With Others*

Lastly, Keresi asserts that, while the ALJ's RFC finding provided for only occasional contact with co-workers and supervisors, it did not account for how someone who was "so socially challenged . . . would fare during the times when she is compelled to connect with others." (Doc. 11 at 15). The ALJ's RFC finding provides that Keresi

would have "occasional co-worker contact and supervision," but with "no contact with the public." (Tr. 29). While Keresi undoubtedly has some limitations in terms of social functioning, neither the medical record nor her own description of her symptoms supports a finding that she would be unable to sustain occasional contact with co-workers and supervision. Keresi could, in her own estimation, travel outside of the home for the purpose of shopping and watching movies, and could interact with strangers in stores. (Tr. 57-60). While some records suggest that Keresi was anxious around strangers (Tr. 239-42), no medical professional in the record concluded that Keresi would be unable to work due to an inability to relate to co-workers or supervisors. Keresi navigated mock job interviews with aplomb (Tr. 277-80). There is no indication in the medical record that Keresi's difficulties with social interaction would preclude her from work. I therefore suggest that the ALJ's decision is supported by substantial evidence.

### H.     Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Keresi's Motion for Summary Judgment (Doc. 11) be **DENIED**, the Commissioner's Motion (Doc. 12) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a

copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 20, 2016                                    S/ PATRICIA T. MORRIS
                                                        Patricia T. Morris
                                                        United States Magistrate Judge

## **<u>CERTIFICATION</u>**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.


Date: May 20, 2016                              By <u>s/Kristen Krawczyk</u>
                                                Case Manager